William D. Marler, Esq., WSBA #17233
Andrew Weisbecker, Esq. WSBA #10736
MARLER CLARK, LLP, PS
1301 Second Avenue, Suite 2800
Seattle, WA  98101
Phone: 206-346-1888
Fax: 206-346-1898
Email: bmarler@marlerclark.com

Attorneys for plaintiff

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

SEATTLE DIVISION

| | |
|---|---|
| JESSICA ELLIS, an individual,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>CHIPOTLE MEXICAN GRILL, INC.,<br>a Delaware Corporation,<br><br>　　　　Defendant.<br>_____ | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY DEMAND** |

COMES NOW the plaintiff, Jessica Ellis, ("plaintiff") by and through her undersigned attorney of record, asserting claims against the defendant, Chipotle Mexican Grill, Inc., a Delaware Corporation, ("defendant"), and states and alleges as follows:

### I.　PARTIES

1.　The plaintiff is a resident of Mount Vernon, Washington, and is thus, a citizen of the state of Washington for purposes of diversity jurisdiction.

2. The defendant, Chipotle Mexican Grill, Inc., is a corporation organized and existing under the laws of Delaware, with its registered agent at 160 Greentree Dr. Ste. 101 Dover, Delaware. Chipotle, together with its subsidiaries (collectively the "Company") is, therefore, a citizen of the state of Delaware for purposes of diversity jurisdiction.

3. The Company develops and operates fast-casual, fresh Mexican food restaurants. As of June 30, 2015, the Company operated 1,847 Chipotle restaurants throughout the United States.

4. At all times relevant to the allegations in this complaint, the Company was registered to do business, and did conduct business, in the State of Washington.

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 USC § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the defendant has certain minimum contacts with the State of Washington such that the maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

6. Venue in the United States District Court for the Western District of Washington is proper pursuant to 28 USC § 1391(a) (2) because a substantial part of the events or omissions giving rise to the plaintiff's claims and causes of action occurred in this judicial district, and because the defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## III. GENERAL ALLEGATIONS

**Current Chipotle *E. coli* Outbreak**

7. As of Wednesday, November 11, 2015, the investigation into an outbreak of *E. coli* illnesses by the FDA, Centers for Disease Control and Prevention (CDC), along with state and local officials in Oregon and Washington State, has linked 39 reported cases to Chipotle restaurants in

Oregon and Washington.

8. In Washington, residents of Clark (12), Cowlitz (3), Island (2), King (6), Skagit (5), and Whatcom (1) counties have been reported as outbreak cases. Of the 29 Washington cases, nearly all of them have reported having been at Chipotle restaurants before getting sick. Eleven of the Washington residents were hospitalized. Ill persons range in age from 1 to sixty-seven.

9. There are five Washington restaurants associated with this outbreak: Hazel Dell, 7715 NE 5th Avenue, Suite 109, in Vancouver; 1404 Broadway Avenue and 4229 University Way NE in Seattle; 512 Ramsey Way 101 in Kent; and 1753 S. Burlington Blvd. in Burlington.

10. The Oregon Health Authority is reporting ten cases of Shiga toxin *E. coli* O26 linked to eating at Chipotle in the Portland Metro area. In Oregon, people in Multnomah, Clackamas, Washington, Columbia, Benton, and Deschutes counties have reported symptoms. Among the Oregon cases, three have been hospitalized.

11. Five locations in Oregon are involved, all of them in the Portland Metro area: Cascade Station at 9687 N.E. Cascades Parkway; Washington Square at 9120 S.W. Hall Blvd.; Lake Oswego at 8 Centerpointe Dr.; Tanasbourne at 2048 N.W. Stucki Ave., and Sunnyside in the Clackamas Town Center.

12. In total, 43 Chipotle restaurants have been closed in the two states.

13. As the Oregon Health Authority, Washington State Department of Health, Food and Drug Administration, and CDC are working with local health departments in the Portland metro region, and in other Oregon Counties, the Washington Department of Health Food Safety Program staff is working to establish criteria for the restaurants in Washington State to reopen.

**Prior Chipotle Foodborne Illness Outbreaks**

14. In September 2015, Minnesota Department of Health and Minnesota Department of Agriculture investigators reported an outbreak of *Salmonella* Newport among customers of 17

different Chipotle restaurants located primarily in the Twin Cities metro area, with one in St. Cloud and one in Rochester. Meal dates ranged from August 16 to August 28, 2015. Illness onset dates occurred between August 19 and September 3. As of September 16, 2015, there were 64 outbreak-associated cases. Nine persons required hospitalization.

15. In August 2015, Ventura County Environmental Health and Ventura County Public Health Division staff investigated an outbreak of Norovirus among patrons of a Chipotle restaurant located in the Simi Valley Towne Center. During the week of August 18, 2015, about 80 customers and 18 restaurant employees reported symptoms. Laboratory testing of patient specimens confirmed the presence of Norovirus.

16. In September 2009, a cluster of patients who had been infected with an indistinguishable strain of *E. coli* O157:H7 was identified. Initially case-patients were identified in Colorado, Utah, and New York State. The Colorado case-patients had all eaten at the same Chipotle Restaurant in Boulder, Colorado, on September 4, 2009. In Utah, all case-patients had eaten at the Cafe Rio Restaurant located in Salt Lake City, Utah, between August 31 and September 4, 2009. The New York State case patient had similarly eaten at a Chipotle Restaurant. A case control study involving Utah and Colorado case-patients found that eating romaine or iceberg lettuce was associated with risk of illness. A traceback of the romaine lettuce led to a common harvester/shipper, Church Brothers, LLC, located in Salinas, California.

17. In April 2008, patrons of a Chipotle Grill Restaurant near Kent State University in Kent, Ohio, developed diarrhea, nausea and vomiting due to Norovirus. Many of those affected were Kent State University students who had eaten burritos at Chipotle. Restaurant coupons were given in exchange for donating blood, which resulted in a large number of exposures and illnesses.

18. In March 2008, persons who dined at the Chipotle restaurant located in La Mesa, California, between March 1 and April 22, 2008, developed hepatitis A. Restaurant employees were

tested for hepatitis A subsequent to the outbreak and had no evidence of recent hepatitis A infection. No source for the outbreak was definitively determined.

### *E. coli* O26

19. *E. coli* O26 is grouped with other non-O157 Shiga toxin-producing *Escherichia coli* (STEC). Incidence of non-O157 STEC, including O26, is increasing because of increased laboratory capacity for its detection.

20. Non-O157 STEC has been reportable since 2000 and, since then, STEC O26 has accounted for 26 percent of all non-O157 STEC cases.

21. STEC are an important cause of diarrhea and the major cause of post-diarrheal hemolytic uremic syndrome.

### Symptoms of an *E. coli* O26 Infection

22. *E. coli* O26 infection is characterized by the sudden onset of abdominal pain and severe cramps, followed within 24 hours by diarrhea. As the disease progresses, the diarrhea becomes watery and then may become grossly bloody –bloody to the naked eye. Vomiting can also occur, but there is usually no fever. The incubation period for the disease (the period from ingestion of the bacteria to the start of symptoms) is typically 3 to 9 days, although shorter and longer periods are not unusual. In most infected individuals, the intestinal illness lasts about a week and resolves without any long-term problems.

### Complication of an *E. coli* O26 Infection

23. Hemolytic Uremic Syndrome (HUS) is a severe, life-threatening complication of an *E. coli* O26 bacterial infection. Although most people recover from an *E. coli* O26 infection, about 5-10% of infected individuals go on to develop HUS. *E. coli* O26 is responsible for over 90% of the cases of HUS that develop in North America. Some organs, such as the kidney, pancreas, and brain, appear more susceptible than others to the damage caused by these toxins, possibly due to the

presence of increased numbers of toxin-receptors.

24.     Thrombotic Thrombocytopenic Purpura (TTP) is a clinical syndrome defined by the presence of thrombocytopenia (low blood platelet counts) and microangiopathic hemolytic anemia. This has generally been recognized as "adult HUS." There are many possible causes, including *E. coli* O26, all of which act through the common mechanism of inducing endothelial cell damage. The damage triggers a cascade of biochemical events that ultimately leads to the characteristic feature of TTP—widespread dissemination of hyaline thrombi, which are composed predominantly of platelets and fibrin and block the terminal arterioles and capillaries (microcirculation) of most of the major body organs, commonly including the heart, brain, kidneys, pancreas and adrenals. Other organs are involved to a lesser degree. The pathophysiology of this disease results in multisystem abnormalities and the clinical manifestations of the syndrome.

**The Plaintiff's Illness**

25.     The plaintiff is a resident of Mount Vernon, Washington. On October 22, 2105, the plaintiff purchased and consumed food at the defendant's restaurant located at 1753 S Burlington Blvd, Burlington, WA 98233.

26.     On October 28, while at work, the plaintiff began to experience gas and bloating, which persisted and eventually made her sick to her stomach and irritable. When she could no longer focus at work because of the sharp pains, she left to return home.

27.     Once home, the plaintiff wrapped herself around a hot water bottle to sooth the pain.

28.     Throughout the remainder of that day and the next, the plaintiff's symptoms grew progressively worse and she began to experience diarrhea. On Thursday morning, the plaintiff woke up and noticed that her diarrhea had turned mostly bloody.

29.     Lethargic and miserable, and scared to lie down because she was afraid that she

might not wake up, the plaintiff went to Skagit Regional Urgent Care Clinic. While she sat and waited to be seen, the plaintiff sat hunched over in the waiting room.

30. Once she was called, the plaintiff submitted a blood sample, underwent a CT scan, and was immediately treated with intravenous (IV) fluids. Prior to receiving IV fluids, the plaintiff had mentioned that her "veins were shy." It took six attempts before the plaintiff would successfully have the IV needle successfully in place.

31. After receiving IV fluids and medicine, the plaintiff was diagnosed with a swollen colon, given a stool sample test kit to bring back the following day, and released home.

32. That night, the plaintiff was miserable. And the next morning, she continued to experience uncontrollable bouts of bloody diarrhea. She called the doctor's office again and was advised to return to the Emergency Room.

33. The plaintiff's father picked her up because she felt unable to drive herself. She was immediately checked in, "poked a few more times for IV's," treated with IV pain medications, and submitted additional blood for laboratory testing.

34. The plaintiff was again released from the hospital, but this time she went to her father's house. Still in stabbing pain and with bloody diarrhea, the plaintiff slept and stayed there for two days.

35. Eventually, the plaintiff's pain and bloody diarrhea began to subside. Although she continues to experience "stinging sensations" in her abdomen and back. The plaintiff has a follow-up appointment at the SRC Residency Clinic in Mount Vernon on Friday, November 6, 2015.

36. As a result of her *E. coli* O26 infection, the plaintiff has been required to miss six days of work so far, and has had to change her plans to visit Hawaii for 6 days as well.

## IV.     CAUSES OF ACTION

### Strict Liability—Count I

37.     The defendant was, at all times relevant to this Complaint, the manufacturer and seller of the adulterated food product that is the subject of this action.

38.     The adulterated food product that the defendant manufactured, distributed, and sold was, at the time it left the defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *E. coli*, a deadly pathogen.

39.     The adulterated food product that the defendant manufactured, distributed, and sold was delivered to the plaintiff without any change in its defective condition. The adulterated food product that the defendant manufactured, distributed and sold, was used in the manner expected and intended, and, as such, was consumed by the plaintiff.

40.     The defendant owed a duty of care to the plaintiff to design, manufacture, and sell, a food product that was not adulterated, which was fit for human consumption, that was reasonably safe in construction, and that was free of pathogenic bacteria or other substances injurious to human health. The defendant breached this duty.

41.     The defendant owed a duty of care to the plaintiff to design, prepare, serve, and sell food that was fit for human consumption, and that was safe to the extent contemplated by a reasonable consumer. The defendant breached this duty.

42.     As a direct and proximate result of the defendant's manufacture, distribution, and sale of a defective product in an unreasonably dangerous condition, the plaintiff sustained injuries and damages in an amount to be determined at trial.

### Breach of Warranty—Count II

43.     The defendant is liable to the plaintiff for breaching express and implied warranties that it made regarding the adulterated food product that caused the plaintiff's injuries.

44. These express and implied warranties included the implied warranties of merchantability and fitness for a particular purpose, and the express warranty, through its sale of food to the public, and by the statements and conduct of its employees and agents, that the food product it prepared and sold to the plaintiff was fit for human consumption, and not otherwise adulterated or injurious to health.

45. The plaintiff alleges that the *E. coli*-contaminated food product that the defendant sold to him would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

46. The plaintiff alleges that the *E. coli*-contaminated food product that the defendant sold to him was not fit for the purposes intended—*i.e.* human consumption—and that this food product was therefore in breach of the implied warranty of fitness for its intended purpose.

47. As a direct and proximate cause of the defendant's breach of warranties, the plaintiff sustained injuries and damages in an amount to be determined at trial.

## **Negligence—Count III**

48. The defendant owed the plaintiff a duty to use reasonable care in the manufacture, distribution, and sale of its food product. Compliance with this duty would have prevented or eliminated the risk that the defendant's food products would become adulterated with *E. coli*, or any other dangerous pathogen. The defendant breached this duty and, was therefore, negligent.

49. The defendant had a duty to properly supervise, train, and monitor its respective employees, and to ensure their compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products. The defendant breached this duty and, was therefore, negligent.

50. The defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with

applicable federal, state, and local laws, ordinances and regulations, and that were clean, free from adulteration, and safe for human consumption. The defendant breached this duty and, was therefore, negligent.

51. As a direct and proximate result of the defendant's acts of negligence, the plaintiff sustained injuries and damages in an amount to be determined at trial.

### Negligence Per Se—Count IV

52. The defendant had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including the requirements of the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301 *et seq.*), and the Washington adulterated food statutes.

53. The plaintiff is among the class of persons designed to be protected by these statutes, laws, regulations, and safety codes or provision pertaining to the manufacture, distribution, storage, and sale of food products.

54. The defendant failed to comply with the provisions of the health and safety acts identified above and, as a result, was negligent *per se* in its manufacture, distribution, and sale of a food product adulterated with *E. coli*, a deadly pathogen.

55. As a direct and proximate result of conduct by the defendant that was negligent *per se*, the plaintiff sustained injury and damages in an amount to be determined at trial.

### V.   DAMAGES

56. The plaintiff has suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the defendant, in an amount that shall be fully proven at the time of trial. These damages include, but are not limited to damages for: general pain and suffering, past and future; loss of enjoyment of life, past and future; medical and medical related expenses, past and future; travel and travel-related expenses, past and future;

emotional distress, past and future; pharmaceutical expenses, past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff prays for judgment against defendant as follows:

A. Ordering compensation for all general, special, incidental, and consequential damages suffered by the plaintiff as a result of the defendant's conduct;

B. Ordering statutory prejudgment interest;

C. Awarding plaintiff reasonable attorneys' fees and costs, to the fullest extent allowed by law; and

D. Granting all such additional relief as this Court deems just and equitable.

DATED: November 6, 2015

MARLER CLARK, LLP, PS

  s/ Andrew Weisbecker
Andrew Weisbecker, Esq., WSBA #10736
William D. Marler, Esq., WSBA # 17233
Attorneys for Plaintiff
1301 Second Avenue, Suite 2800
Seattle, WA 98101
Phone: 206-346-1888
Fax:  206-346-1898
Email:  bmarler@marlerclark.com